**Lokmar Yazid ABDUL–WADOOD,
Plaintiff-Appellant,**

v.

**Jack DUCKWORTH and Edward Cohn,
Defendants–Appellees.**

**No. 86–1607.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1987.

Decided Oct. 24, 1988.

Rehearing and Rehearing En Banc
Denied Jan. 9, 1989.

Terri L. Mascherin, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

David A. Nowak, Deputy Atty. Gen.'s Office, Indianapolis, Ind., for defendants-appellees.

Before CUMMINGS, CUDAHY and COFFEY, Circuit Judges.

CUDAHY, Circuit Judge.

Lokmar Yazid Abdul–Wadood, a state prisoner, brought an action pursuant to 42 U.S.C. § 1983 against certain state prison officials. Abdul–Wadood claims that the prison officials violated his right to due process by holding his administrative classification hearing in the absence of his lay advocate and, later, by confining him to disciplinary segregation without charging him with a rule violation or providing him with a hearing. Abdul–Wadood appeals a grant of summary judgment in favor of the defendants on both issues. He contends also that the district court improperly dismissed his damage claim and that it abused its discretion in denying him court-appointed counsel.

We agree that the damage claim should not have been dismissed at this stage. We reverse the grant of summary judgment in part and vacate and remand with respect to the damage claim.

## I.

Abdul–Wadood, serving a sentence for murder and robbery, was transferred from the Indiana Reformatory to the Indiana State Prison on December 29, 1982, for classification reasons. Abdul–Wadood received notice stating that he had been placed in administrative segregation and that a hearing would follow. A classification hearing was held on January 7, 1983. Abdul–Wadood designated a lay advocate to represent him at the hearing. Abdul–Wadood appeared at the hearing, but his lay advocate allegedly did not. Despite his protests, the administrative segregation committee proceeded with the hearing and formally recommended that he be placed in administrative segregation in the New Service Building Segregation Unit (the "NSB Unit"), to which he already had been assigned.

On January 25, 1983, there was an attempted escape from the NSB Unit. Abdul–Wadood did not participate in the escape attempt. In response to the incident, the wardens imposed upon all inmates in the NSB Unit restrictions on visitation, reading material, clothing and use of the commissary and the telephone. Abdul–Wadood claims that these restrictions are the same as those imposed on inmates in disciplinary segregation.[1] He claims further that these restrictions continued until June. According to Duckworth, the prison superintendent, and Cohn, the assistant superintendent, the inmates were restored full visitation rights one week after the escape attempt.

In August 1983, Abdul–Wadood brought a *pro se* action under 42 U.S.C. § 1983 against Duckworth and Cohn, alleging that they violated his due process rights both by placing him in disciplinary segregation for several months without charging him as a rule violator and by conducting his administrative segregation reclassification hearing without the presence of his lay advocate. He sought damages for emotional distress and mental anguish.[2]

Abdul–Wadood requested court-appointed counsel. The district court responded by giving him sixty days to demonstrate to the court that he had attempted to obtain counsel on his own. More than ten months later, the district court denied Abdul–Wadood's request for counsel.

Meanwhile, Abdul–Wadood was attempting to take discovery on his own. In October 1983, he wrote a letter to the court, requesting a copy of the guidelines that govern the handling by prison officials of disciplinary matters. The court did not respond. In January 1984, Abdul–Wadood filed a document request, seeking production of his central file, prison reports, internal memoranda relating to his status and copies of Indiana prison rules, regulations and policy statements. The defendants objected to producing the documents, claiming that Abdul–Wadood had access to his institutional packet via his prison counselor, a method less burdensome to the defendants, and that many of the documents in his institutional packet were unnecessary or irrelevant to his case.

Abdul–Wadood moved to compel production of the documents and later moved to depose Duckworth, Cohn and other prison officials. Three months later, the court

---

1. Abdul–Wadood explained in his affidavit that the inmates were allowed out of their cells only one hour each day, that they were limited to six items of reading material, including legal material, that they could not make telephone calls, order items from the commissary or keep personal possessions in their cells and that they were forced to wear prison-issued overalls. *See* Plaintiff's Supplemental Appendix at 136–37. According to a memorandum from Duckworth, inmates in Abdul–Wadood's wing of the NSB Unit were limited to visits from immediate family members and attorneys. *See id.* at 101.

2. Abdul–Wadood later amended his complaint to claim that Duckworth and Cohn violated his eighth amendment rights beginning October 17, 1983, by mandating that he shave, bathe, exercise and wash his clothes within 30 minutes. This additional restriction apparently resulted from his actual placement in disciplinary segregation for assaulting a prison officer. The record indicates that he was found guilty after a Conduct Adjustment Board hearing, as to which Abdul–Wadood has claimed no due process violation. Abdul–Wadood does not appeal the district court's grant of summary judgment in favor of Duckworth and Cohn on the eighth amendment claim.

denied his motion to depose, ruling that he had the "ability to utilize other discovery tools available to him." *Abdul–Wadood v. Duckworth*, No. S 83–0372, order at 1 (N.D.Ind. Dec. 6, 1984). The court apparently never ruled on the motion to compel. Abdul–Wadood's only successful attempt at discovery was Duckworth's response to the first set of interrogatories.

In May 1985, the district judge conducted a hearing during which he asked Abdul–Wadood several questions relating to his claims against Duckworth and Cohn. Concerning damages, the judge asked, "You do have claims for money damages against Jack Duckworth and Edward Cohen [sic] in their official capacities?" Abdul–Wadood answered, "Yes." Hearing Transcript at 18–19. The court then dismissed the damage claim against Duckworth and Cohn in their official capacities.

Abdul–Wadood moved to reconsider the dismissal of his damage claim, asking the court to consider his *pro se* complaint more liberally and again requesting appointment of counsel. The court denied the motion because Abdul–Wadood had not "indicated to [the] court nor has he served defendants with a complaint in any capacity other than their official capacity." *Abdul–Wadood v. Duckworth*, No. S 83–0372, order at 1 (N.D.Ind. June 22, 1985).

The court ultimately granted summary judgment for Duckworth and Cohn on all of Abdul–Wadood's claims, finding no basis for relief for Abdul–Wadood under section 1983.

To affirm the district court's summary disposition of the case, we must find that the pleadings, affidavits and answers to interrogatories reveal "no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Caldwell v. Miller*, 790 F.2d 589, 597 (7th Cir.1986). Any reasonable inferences must be drawn in favor of Abdul–Wadood, the non-moving party. *Id.*

## II.

We consider first whether Abdul–Wadood was confined to administrative segregation in violation of the fourteenth amendment because his January 7, 1983 classification hearing was conducted in the absence of his lay advocate. To invoke the protections of procedural due process, Abdul–Wadood must demonstrate that he had at stake a protected liberty interest. *Morrissey v. Brewer*, 408 U.S. 471, 481–82, 92 S.Ct. 2593, 2600–01, 33 L.Ed.2d 484 (1972). Although the due process clause itself does not give rise to a liberty interest in remaining in the general prison population, *Hewitt v. Helms*, 459 U.S. 460, 466–67, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983); *Meriwether v. Faulkner*, 821 F.2d 408, 414–15 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987), Indiana statutes and regulations may provide Abdul–Wadood with a protected liberty interest in remaining free from the restrictions of administrative segregation. *Helms*, 459 U.S. at 470–71, 103 S.Ct. at 870–71.

■ It is not clear to us that Indiana has created for Abdul–Wadood the prerequisite liberty interest.[3] In any event, we need not decide this issue, for, even if triggered, the procedural guarantees of the due pro-

---

**3.** Arguably, Ind.Code § 11–10–1–7(a) provides prisoners with a liberty interest in remaining in the general prison population:

An offender may be involuntarily segregated from the general population of a facility or program if the department first finds that segregation is necessary for the offender's own physical safety or the physical safety of others.

This statute contains "language of an unmistakably mandatory character," *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), and predicates segregation on a finding that it is necessary to ensure safety, *id.* at 472, 103 S.Ct. at 871. Of course, the prison regula-

tions concerning administrative segregation (which are not part of this record) must also be examined in light of *Helms*.

A district court has recently held that Indiana prison "procedures and policies do not create a liberty interest and do not contain the heavy mandatory language which existed in the ... *statutes* which were reviewed in *Hewitt.*" *Shropshire v. Duckworth*, 654 F.Supp. 369, 375 (N.D.Ind.1987) (emphasis in original). This court has not yet been presented with the opportunity to assess in its entirety Indiana's statutory and regulatory scheme with respect to administrative segregation in prisons.

cess clause, as interpreted in *Helms*, do not entitle him to a lay advocate at his classification hearing. *Helms* requires only "an informal, nonadversary evidentiary review," which includes advance notice of the reason for placement in administrative segregation and an opportunity for the prisoner to present his views to the decisionmaker. *Id.* at 476, 103 S.Ct. at 874. The procedural safeguards required for confinement in administrative segregation were satisfied in the case before us.

Thus, we hold that Abdul–Wadood's assignment to administrative segregation, following a hearing in which the lay advocate was not present, did not violate his right to procedural due process.

### III.

We next examine whether, after the attempted prison escape by other prisoners in the NSB Unit on January 25, 1983, restrictions were imposed upon Abdul–Wadood in violation of the due process clause. Abdul–Wadood concedes that immediately following the incident, prison officials had the authority to take any necessary emergency action, "including temporarily restricting the rights of inmates like plaintiff who were not charged with disciplinary violations." [4] Plaintiff's Supplemental Brief at 19. Abdul–Wadood claims, however, that once the state of emergency ended, the conditions—which were identical to those imposed upon prisoners relegated to disciplinary segregation—could be continued in effect only if Abdul–Wadood were found guilty of a rule violation after notice and a hearing sufficient to satisfy the procedural due process requirements set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). [5]

Duckworth and Cohn respond that the restrictions were placed on Abdul–Wadood pursuant to a "lockdown" of the entire unit following the attempted escape. As such, Abdul–Wadood's administrative segregation status remained unchanged, presumably until June. Because the removal of various privileges was not carried out as a punishment for misconduct on Abdul–Wadood's part, these deprivations cannot fairly be said to involve disciplinary segregation. Hence, according to the defendants, Abdul–Wadood was not entitled to the procedural safeguards associated with disciplinary action when restrictions were imposed at the time of the attempted prison escape. The district court, in granting summary judgment for Duckworth and Cohn, held simply that the due process requirements of *McDonell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and *Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675, had been satisfied. [6]

The parties do not dispute that, if Abdul–Wadood had been in fact subjected to disciplinary action, he would have had at stake a liberty interest sufficient to invoke

---

4. Prisoners' rights may be suspended during an emergency pursuant to Ind.Code § 11–11–5–8, which provides:

   Any of the rights or procedures enumerated in this chapter may be suspended upon declaration by the official in charge of the facility or program that there exists an emergency situation threatening the general security of the facility or program. The rights or procedures again apply upon declaration by the official in charge of the facility or program that the emergency had been resolved.

5. Under *Wolff v. McDonnell*, 418 U.S. 539, 563–72, 94 S.Ct. 2963, 2978–82, 41 L.Ed.2d 935 (1974), before disciplinary action may be taken against a prisoner, he must receive written notice of the charges against him, the right to call witnesses and present evidence before an impartial tribunal, the assistance of a lay advocate if necessary and a written statement of the tribunal's decision and its reasons.

6. The district court may have held, alternatively, that Duckworth and Cohn cannot be held liable for violating Abdul–Wadood's constitutional rights because they acted at most negligently. In this connection, the court relied on the companion cases of *Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986). The Supreme Court in *Daniels*, however, indicated that these cases do not apply to section 1983 actions involving deliberate prison disciplinary decisions. 474 U.S. at 333–34, 106 S.Ct. at 666–67. In any event, Duckworth and Cohn did not argue, in their motion for summary judgment, that they had been merely negligent in depriving Abdul–Wadood of privileges.

the protection of the due process clause.[7] In that connection, we cannot accept the defendants' position that because Abdul-Wadood's segregation status was never *officially* changed in connection with the January through June restrictions, he could not have been deprived of a protected liberty interest during that long period. The label prison officials attach to their actions is not alone determinative of the nature of a prisoner's deprivation. *See McKinnon v. Patterson,* 568 F.2d 930, 938 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Carlo v. Gunter,* 520 F.2d 1293, 1295 (1st Cir.1975).

■ On the other hand, merely because Abdul-Wadood's loss of privileges was qualitatively equivalent to that experienced by prisoners segregated for disciplinary reasons does not entitle him to the full range of procedural safeguards set forth in *McDonnell,* 418 U.S. at 563–72, 94 S.Ct. at 2978–82.[8] If the restrictions were imposed upon the unit as a whole, as a measured response to an emergency, and were continued in force until June to ensure the security of the unit, the restraints on Abdul-Wadood's liberty do not implicate due process guarantees. *Cf. Caldwell,* 790 F.2d at 602 (unless state statutes or regulations create liberty interest, lock-down restrictions do not trigger procedural safeguards of due process clause).

Thus, the issue becomes whether the restrictions placed on Abdul-Wadood were for the purpose of punishing him—for being a troublemaker generally or for committing as yet unidentified bad acts—or, alternatively, served to secure the NSB Unit from further escape attempts. If the former, Abdul-Wadood was presumably deprived of his right to notice and an opportunity to be heard. *See supra* note 5.

In support of their motion for summary judgment, Duckworth and Cohn contended (1) that privileges were limited for all prisoners on the NSB Unit, (2) that these unit restrictions were a necessary response to an emergency situation and (3) that visitation privileges were restored within a week. The court had before it, however, evidence from which it could reasonably have inferred that some type of disciplinary action had been taken against Abdul-Wadood. Abdul-Wadood submitted several affidavits. In the first, he stated that he "was reduced to disciplinary, punishment segregation and all the loss of liberty, privileges, and allowances characteristics [sic] of punishment segregation." Plaintiff's Supplemental Appendix at 18. In an affidavit filed in connection with his opposition to the defendants' summary judgment motion, Abdul-Wadood stated that he "was told by Sgt. Bachelor, who was the Officer in charge of the unit, that [he] had been reduced to disciplinary status." *Id.* at 136.

It is also relevant that, during the hearing before the district court, Abdul-Wadood testified as follows:

> On January 25 on the unit that I was on some inmates allegedly attempted to escape. And from what I was told some bars were sawed and the administration had to come back in and secure it. And temporarily they told me they had to change the policy and I was reduced on January 25, 1983 from administrative segregation. That is a non-punishment segregation. I was put to disciplinary segregation.
>
> . . . .

---

7. The Indiana Code arguably provides prisoners with a liberty interest in avoiding disciplinary action:

    Before imposing any disciplinary action, the department shall afford the person charged with misconduct a hearing to determine his guilt or innocence and, if guilty, the appropriate action.

    Ind.Code § 11–11–5–5. This section further describes the rights associated with a disciplinary hearing. *See also* Ind.Code § 11–11–5–6 ("Disciplinary action may not be taken against a person before a determination of guilt.").

8. In *Helms,* the restrictions suffered by the prisoner in administrative segregation were "substantially identical" to the conditions of disciplinary segregation. 459 U.S. at 463 n. 1, 103 S.Ct. at 867 n. 1. The Supreme Court reasoned, however, that because the interests at stake in administrative segregation differ from the interests involved in disciplinary segregation, confinement to administrative segregation does not require as many procedural safeguards. *Id.* at 472–76, 103 S.Ct. at 871–73.

... I am claiming that I was forced to be upon disciplinary segregation for approximately six months without having violated or being found guilty of a rule without the normal procedures that are enacted in order to achieve that classification. I discussed this several times informally with the warden and with the assistant warden and asked they make the necessary changes.... I asked them and appealed even to the unit team that they had, and they told me it was up to the warden. They could not change it. It was in his hands.

Hearing Transcript at 14–18.

It is significant that, in his response to the interrogatories, Duckworth did not contradict Abdul–Wadood's assertions concerning his disciplinary status. In fact Duckworth intimated that Abdul–Wadood was legitimately serving disciplinary time, that had been suspended, for a previous violation.[9]

In support of their motion for summary judgment, defendants submitted the affidavit of the prison's supervisor of classification, which explained:

That Mr. Love was also on the unit when the attempted escape and following disturbance occurred in January, 1983. Apparently no conduct reports or guilty findings are on record of Mr. Love for January, 1983. Any action taken against Mr. Love in terms of his privileges were authorized as unit sanctions, not individual sanctions or any changes in his A/S [Administrative Segregation] status.

Plaintiff's Supplemental Appendix at 99–100. The defendants also submitted copies of the memoranda, issued by Duckworth, setting forth the restrictions on visitation, legal documents and personal mail.

Perhaps, if Abdul–Wadood had been more successful in conducting discovery on this matter, we would have a clearer picture of the actions taken by the defendants, and of their purposes. Unfortunately, in major part because he had no counsel, he failed to uncover the significant documents in his file and to obtain the relevant prison regulations.

■ The evidence that was presented to the district court, however, raises a genuine issue as to whether restrictions were

---

**9.** Duckworth's response to the interrogatories fails to demonstrate that Abdul–Wadood was not the subject of prison disciplinary action:

I, Jack R. Duckworth, being duly sworn under oath do respond to Plaintiff's interrogatories as follows:

....

*INTERROGATORY NO. 6.* Is it not a fact and a matter of record that on Jan. 25, 1983, that Plaintiff was that day informed by Sgt. Cecil Batchelor, and later on by numerous other prison officials, including the defendants, that he had been transferred from his AS status to disciplinary segregation and grievous loss of privileges and liberty of the punitive disciplinary segregation, even though he had not been formally charged, tried, or found guilty of an Institutional rule infraction?
*ANSWER:* Do not know.
*INTERROGATORY NO. 7:* It is not a fact that casemanager Tom Steepro and William Hartley informed Plaintiff numerous times that he was improperly held on disciplinary segregation and that they lead plaintiff to believe that they were in the process of re-establishing AS and would restore him to his proper AS status?
*ANSWER:* Do not know.
*INTERROGATORY NO. 8:* Is it not true that plaintiff brought his complaints to the defend-

ants because it was their order that reduced plaintiff from non-punitive AS status to punitive disciplinary segregation, yet the defendants failed to take action to right their wrongdoing even after they had been informed of it?
*ANSWER:* The record indicates additional disciplinary time remained to be served.
*INTERROGATORY NO. 9:* Is it not true that Plaintiff remained on disciplinary segregation and its substantial loss, without having violated a rule for approximately six months?
*ANSWER:* Inmate was given additional disciplinary time as sentenced by the Conduct Adjustment Board during his detention period.
*INTERROGATORY NO. 10:* Is it not true that the defendants are fully aware of the fact that they cannot confine an offender to punishment segregation without him having violated a prison rule and been tried and found guilty of violating that rule?
*ANSWER:* Inmate was given additional disciplinary time as sentenced by the Conduct Adjustment Board during his detention period.
*INTERROGATORY NO. 11:* Is it not a fact that before the substantial and grievous loss of disciplinary segregation can be imposed upon an offender he must be accorded the due process procedure outlined in the *Wolff v. McDonnell* ruling?
*ANSWER:* Due process rights were granted.
Plaintiff's Supplemental Appendix at 49–51.

placed on Abdul–Wadood pursuant to disciplinary action, a fact material to his claim that the defendants violated his right to due process. Hence, we reverse the grant of summary judgment in favor of Duckworth and Cohn and remand for further proceedings.

## IV.

Having concluded that Abdul–Wadood may have a cause of action under section 1983, we must consider the district court's *sua sponte* dismissal of the damage claim against Duckworth and Cohn.

Abdul–Wadood's *pro se* complaint does not indicate whether he is suing defendants in their official or in their individual capacities, a distinction of great importance, for to recover damages Abdul–Wadood must seek to impose personal liability upon Duckworth and Cohn by suing them in their individual capacities. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985); *Hadi v. Horn,* 830 F.2d 779, 782–83 (7th Cir. 1987). That Abdul–Wadood was not cognizant of the ramifications of failing to allege that he was bringing an individual-capacity action is not surprising. "[T]his distinction apparently continues to confuse lawyers and confound lower courts." *Graham,* 473 U.S. at 165, 105 S.Ct. at 3105.

In light of the fact that Abdul–Wadood was proceeding *pro se,* the district court was unduly summary in concluding that he had failed to state a valid claim for damages. "It is well settled that *pro se* litigants are not held to the stringent standards applied to formally trained members of the legal profession, and that, accordingly, we construe *pro se* complaints liberally." *Caldwell,* 790 F.2d at 595 (citing *Hughes v. Rowe,* 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980); *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972)); *see also Sizemore v. Williford,* 829 F.2d 608, 609–10 (7th Cir.1987).

When the nature of a section 1983 suit is unclear from the face of the complaint, a court must consider the totality of the circumstances. *Hadi,* 830 F.2d at 783. In the present case, Abdul–Wadood's complaint clearly seeks monetary compensation from Duckworth and Cohn. Given that Abdul–Wadood drafted his complaint, his claim for damages is sufficient to alert the court and the defendants that he may be suing them in their individual capacities. The court therefore should have given Abdul–Wadood the opportunity to explain the nature of his claim. Instead, during the hearing that gave rise to the dismissal of the damage claim, the court asked Abdul–Wadood a single question, "You do have claims for money damages against Jack Duckworth and Edward Cohen [sic] in their official capacities?" To this, Abdul–Wadood responded, "Yes." Transcript at 18–19.

Although the court subsequently explained that the eleventh amendment bars Abdul–Wadood from recovering damages against state prison officials in their official capacities,[10] it is unlikely that Abdul–

10. The court made the following comments during the hearing:

> I am going to deal summarily in a few minutes with the damage claim against Duckworth and Cohen [sic] in their official capacities. The law is absolutely clear on that. There is not any point in wasting time with it in their official capacities, not in their individual capacities. And the law is so clear-cut on that now from this court, from the Court of Appeals again, and Justice Stewart in the *Owen* case, but the cases that I have written and there is no doubt about it in their official capacities money damages cannot be secured against them under the Eleventh Amendment. Absolutely clear and unequivocal. That doesn't mean that there can't be some dam-

ages secured against them in their personal capacities. That point has been very well made also.

Transcript at 21–22. In dismissing the damages claim, the court continued:

> I am not going to waste your time that under the Eleventh Amendment of the Constitution of the United States under Justice Stewart's opinion in *Owen versus Lash* and in a whole plethora of opinions that I have written there is absolutely no way that any damage claim can be collected against Duckworth of [sic] Cohen [sic] in their official capacities. I underline in their official capacities. And such damage claims are now dismissed. Get them out of here because they are not any bases. I am not talking about in their individual capacities.

Wadood, unrepresented by counsel, understood the significance of his affirmative response to the court's question. The court did not invite him to explain the nature of his claim or to amend his complaint. The court later denied Abdul–Wadood's motion to reconsider the dismissal, stating, "Plaintiff to date has not indicated to this court nor has he served defendants with a complaint in any capacity other than their official capacity." *Abdul–Wadood v. Duckworth*, No. S 83–0372, order at 1 (N.D.Ind. June 22, 1985).

■ Under the circumstances of the case, the district court erroneously dismissed Abdul–Wadood's damage claim. Claims of a section 1983 litigant, proceeding *pro se*, should not be dismissed on the basis of an unclear complaint and the answer to a single, somewhat suggestive, question. Thus, we vacate the order dismissing Abdul–Wadood's damage claim.

## V.

The final issue we must address is whether the district court abused its discretion in denying Abdul–Wadood's repeated requests for the assistance of counsel. The record indicates that Abdul–Wadood asked for court-appointed counsel initially in the fall of 1983, because the legal issues were complicated and exceeded his ability and that he renewed his request three times. In May 1984, Abdul–Wadood explained that he had tried unsuccessfully to obtain an attorney. In September 1984, he requested appointed counsel to represent him at depositions. The court denied Abdul–Wadood's request for counsel for the first time in October 1984, because "[t]he factual and legal issues involved [were] not complex and [were] limited to a single issue involving the denial of due process during a

C.A.B. hearing." *Abdul–Wadood v. Duckworth*, No. S 83–0372, order at 2 (N.D.Ind. Oct. 29, 1984). Abdul–Wadood again unsuccessfully requested counsel when he asked the court to reconsider the dismissal of his damage claim.

Abdul–Wadood, of course, has no constitutional right to appointed counsel in this civil action. *Caruth v. Pinkney*, 683 F.2d 1044, 1048 (7th Cir.1982), *cert. denied*, 459 U.S. 1214, 103 S.Ct. 1212, 75 L.Ed.2d 451 (1983). The district court has the discretion to decide whether to appoint counsel for a civil rights litigant, *id.*, and the refusal to appoint counsel will be overturned only when it results in "fundamental unfairness impinging on due process rights." *LaClair v. United States*, 374 F.2d 486, 489 (7th Cir.1967); *see also McNeil v. Lowney*, 831 F.2d 1368, 1371 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1236, 99 L.Ed.2d 435 (1988). We must bear in mind, however, that although "the threshold for reversal of a district court's denial of a motion for the appointment of counsel is high," the district court's discretion is not unreviewable. *Id.* We have instructed courts to consider all the relevant circumstances in ruling on requests for counsel. *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir.1981). Thus, in *Maclin*, we identified several factors that call for the appointment of counsel once the district court determines that the plaintiff's claim has some merit: (1) the plaintiff's ability to investigate the facts; (2) whether the only evidence consists of conflicting testimony, which would require effective cross-examination; (3) the ability of the plaintiff to present his case without counsel; and (4) the complexity of the legal issues involved in the case. *Id.* at 887–88.

*Id.* at 27–28.

Although the court indicated a difference between official-capacity and individual-capacity suits, it did not explain to Abdul–Wadood how properly to seek damages from Duckworth and Cohn. The dissent refers to these comments by the court as two "explanations" of the distinction between individual and official capacity suits. *See infra* at 293. On their face, however, they are not efforts to enlighten the *pro se* plaintiff on how he should characterize his case,

but instead statements of why his case fails on the basis of a perhaps ill-informed answer to a suggestive question.

Similarly, the quotation in the dissent from the earlier case of *Love v. Duckworth*, 554 F.Supp. 1067 (N.D.Ind.1983), *see infra* at 293, does not mention or involve the *legal* distinction between individual and official capacity suits, but instead addresses the *factual* question whether personal involvement has been established (in an individual capacity suit).

■ Applying these factors to Abdul–Wadood's case, we conclude that at least now there is a real question whether or not counsel should be appointed. Although the legal and factual issues presented by this section 1983 claim, at first glance, do not seem particularly complex, they evidently exceeded Abdul–Wadood's ability. For example, Abdul–Wadood seemed not to understand that to obtain damages he must specifically allege in his complaint that he is suing Duckworth and Cohn in their individual capacities. In addition, Abdul–Wadood was unsuccessful in his attempts to discover the facts relevant to his segregation status.

Our conclusion that application of the *Maclin* factors may warrant the appointment of counsel depends, at least in part, upon our review of events that occurred after the district court denied Abdul–Wadood's request. The district court articulated the guidelines set forth in *Maclin*, and we cannot say that it abused its discretion at the time it denied counsel. At the present stage of the proceedings, however, the *Maclin* analysis suggests that the appointment of counsel be reconsidered. Thus, upon remand, the district court is instructed "to make a fresh determination" whether Abdul–Wadood is entitled to court-appointed counsel. *See Hossman v. Blunk*, 784 F.2d 793, 797 (7th Cir.1986).

### VI.

Abdul–Wadood's case, if any, seems to stand or fall on the nature and purpose of the segregation he underwent in 1983. Either he was subjected to punitive segregation or he was not. If he was, either he received due process, or he did not. The present record is indecipherable with respect to these issues, but a relatively small amount of effective discovery could prepare the case for prompt disposition.

For the reasons stated, the orders of the district court are

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.

COFFEY, Circuit Judge, concurring in the result in part and dissenting in part.

I concur in the majority's result that Abdul–Wadood was not entitled to a lay advocate at his classification hearing. However, I dissent from the majority's determinations (1) that Abdul–Wadood raised a genuine issue of material fact concerning the question of whether the restrictions placed upon him were disciplinary in nature, thereby precluding summary judgment in favor of defendants; (2) that the district court improperly dismissed Abdul–Wadood's damages claim; and (3) that the district court should reexamine its determination of whether Abdul–Wadood's request for counsel should be granted.

In addressing the summary judgment issue, the majority appropriately realizes that, in response to the January 1983, escape attempt, "prison officials had the authority to take any necessary emergency action, 'including temporarily restricting the rights of inmates like plaintiff who were not charged with disciplinary violations.'" Majority Opinion at 6–7 (footnote omitted). The conclusion that prison authorities have the right to respond decisively to this type of emergency is required under *Caldwell v. Miller*, 790 F.2d 589, 602 (7th Cir.1986), in which we rejected a procedural due process attack upon a similar "lockdown" at the United States Penitentiary at Marion, Illinois. We observed:

"We acknowledge that the lockdown restrictions significantly impair Caldwell's ability to associate with other inmates, to entertain outside visits, to move about within Marion, to exercise outside his cell, and possibly, to worship. Yet, that does not end the inquiry. The determinative factor in a Due Process Clause analysis is the nature of the interest involved, not its weight. Even assuming that the lockdown restrictions caused Caldwell to suffer a substantial personal deprivation, it in no way follows that these restrictions trigger the procedural protections of the Due Process Clause. This is so irrespective of whether that deprivation might be characterized as a 'grievous loss.' To hold otherwise

'would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than that of the federal courts.'"

(Quoting *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)) (citations omitted).

*Caldwell* is grounded upon the Supreme Court's recognition that prison confinement deprives an inmate of many of life's amenities. In *Bell v. Wolfish*, 441 U.S. 520, 545–46, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), the Court observed: "'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" (Quoting *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). Whether denominated as rights or privileges, these amenities of life may be rightfully restricted because: "Prison officials must be free to take appropriate action to ensure the safety of inmates and correctional personnel and to prevent escape or unauthorized entry." *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878. In *Wolfish*, 441 U.S. at 547–48, 99 S.Ct. at 1878–79, the Court went on to explain:

"[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide range and deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Such considerations are peculiarly within the province and professional expertise of correction officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' Pell v. Procunier, 417 U.S. [817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)].... [J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."*

(Citations and footnotes omitted) (emphasis added).

Consistent with the Supreme Court's requirement that we accord deference to prison officials' responses to emergency situations, we also held in *Caldwell* that the indefinite continuation of "lockdown" conditions does not raise procedural due process problems:

"Even assuming that the lockdown restrictions are permanent, it cannot be said that they brought about conditions of confinement that are qualitatively different from the punishment characteristically suffered by a convict. These conditions in no way constitute an additional punishment. Nor can it be said that they intrude upon Caldwell's personal security in a way that would set them apart from normal confinement, unlike the action of prison officials challenged in *Vitek* [*v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980)]. As such, the continuation of the lockdown restrictions does not implicate a protected liberty interest, and is hence not subject to judicial review under the Due Process Clause."

*Caldwell*, 790 F.2d at 604–605 (footnotes and citations omitted).[1]

---

1. It should be briefly noted that Indiana state law provides:

"Any of the rights or procedures enumerated in this chapter [pertaining to the discipline of prisoners] may be suspended upon declaration by the official in charge of the facility or program that there exists an emergency situation threatening the general security of the facility or program. The rights or procedures again apply upon declaration by the official in charge of the facility or program that the emergency has been resolved."

Ind.Code Ann. § 11–11–5–8.

Indiana state law further provides that even in cases involving personalized discipline, "[a] person charged with misconduct may be confined or separated from the general population of the facility or program for a reasonable peri-

As the majority realizes, in a summary judgment posture, *Caldwell* requires that Abdul–Wadood "raise[ ] a genuine issue as to whether restrictions were placed on [him] pursuant to disciplinary action, a fact material to his claim that the defendants violated his right to due process." Majority Opinion at 287. As the majority also states: "[t]he issue [is] whether the restrictions placed on Abdul–Wadood were for the purpose of punishing him—for being a troublemaker generally or for committing as yet unidentified bad acts—or, alternatively, served to secure the NSB Unit from further escape attempts." *Id.* at 285. If the restrictions were merely part of a general prison "lockdown" such limitations cannot raise due process questions.

However, I disagree with the majority's determination that Abdul–Wadood raised a genuine issue of material fact concerning the individual "disciplinary" nature of the involved restrictions. It is well settled that:

"[W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply 'show that there is some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). 'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no "genuine issue for trial." ' *Id.* at 587, 106 S.Ct. at 1356

(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). 'The court should neither "look the other way" to ignore genuine issues of material fact, nor "strain to find" material fact issues when there are none....' *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir.1987) (quoting *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir.1972))."

*Beard v. Whitley County, REMC,* 840 F.2d 405, 409–10 (7th Cir.1988). The majority's decision ignores the "deference [prison administrators are to be accorded] in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." [2] The majority erroneously "strain[s] to find" a genuine issue of material fact in concluding that Abdul–Wadood's preferred evidence met this standard. A rational trier of fact would not have been able to find in favor of Abdul upon the facts presented.

It is clear that the restrictions were placed on Abdul and the other inmates on January 25, 1983, immediately following an escape attempt. It is also apparent from the record that these were unit-wide sanctions, which were not limited to Abdul–Wadood.[3] The affidavits and statements Abdul presented cannot under any circumstances meet the standards required to permit a rational trier of fact to reach a conclusion that these sanctions were personalized discipline. His generalized statements in his affidavits and at the hearing that he "was reduced to disciplinary, punishment segregation," and that he "was forced to be upon disciplinary segregation for approximately six months without having violated or being found guilty of a rule [violation]" are classic examples of conclusory "self-interested assertions" which fail to

---

od of time if his continued presence in the general population poses a serious threat to himself, others, property, or the security of the facility or program." Ind.Code Ann. § 11–11–5–6. This temporary segregation is subject to periodic review before the final disciplinary determination.

2. *Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878.

3. A series of documents introduced by defendants clearly demonstrate that the various sanctions were applicable to all prisoners, including Abdual–Wadood, on the South side of the New Service Building Segregation Unit.

provide a basis for finding the presence of a genuine issue of material fact. *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986). Failure to raise a genuine issue of material fact is especially clear because even certain of these "self-interested assertions" contained admissions that the challenged restrictions became effective on the very day of the escape attempt. Abdul's reliance on the alleged statement of the officer in charge of his unit that he was subject to "discipline" is also insufficient to raise a genuine issue of material fact in a case in which there is no showing that the officer had authority to speak for the prison on this issue and it is, at best, unclear that he understood the distinction between a "lockdown" and specific discipline of an individual prisoner. *Cf. Hadley v. County of Du Page,* 715 F.2d 1238, 1242 (7th Cir.1983) ("No property interest can arise from the ... assurances since the County Board is not bound by the unofficial acts and statements of its individual members, and therefore cannot be a party to any mutually explicit understanding"). Finally, the Duckworth interrogatory answers cited by the majority fail to raise a genuine issue of material fact. A fair reading of these answers indicates that Abdul-Wadood was subject to additional disciplinary time as the result of a Conduct Adjustment Board determination held pursuant to procedures consonant with due process. Because Abdul did not allege that he was deprived of procedural due process rights with respect to any disciplinary hearing actually held, no genuine issue of material fact has been raised. In sum, the entire record, including affidavits and hearing testimony, is devoid of evidence upon which a trier of fact could base a rational, well-reasoned decision that the restrictions placed on Abdul-Wadood were the results of disciplinary action lacking due process safeguards.

The majority also implies that additional discovery might have aided Abdul-Wadood's ability to present a genuine issue of material fact. I disagree, as the timing of the restrictions placed on Abdul-Wadood clearly establish that these limitations were part of the prison officials' immediate response to the other existing security problems in the population of Abdul-Wadood's area of the NSB segregation unit resulting from the contemporaneous escape attempt. The most ably conducted additional discovery would only confirm that conclusion.

In approaching the issue of whether the district court properly dismissed Abdul-Wadood's damages claim, it should be noted that a proper determination of the summary judgment issue would have resulted in a conclusion that this issue is moot. As I have just demonstrated, Abdul-Wadood failed to present an appropriate claim that he was deprived of due process of law as a result of defendants' unit-wide response to the escape attempt. Because he had no legitimate claim for relief, obviously he cannot be entitled to damages.

However, even if I agreed that the majority had reasoned properly in its summary judgment determination, I would be forced to disagree with its resolution of the damages issue. The majority does not and cannot dispute the fact that damages were unavailable against the defendants in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3104–05, 87 L.Ed.2d 114 (1985). Instead, the majority argues that the damage claims "of a section 1983 litigant, proceeding *pro se,* should not be dismissed on the basis of an unclear complaint and the answer to a single, somewhat suggestive, question." Majority Opinion at 288.

It is difficult for me to understand how the judge could have acted more carefully and appropriately in addressing this issue. The majority admits that the district court explained to plaintiff-appellant Abdul-Wadood on two occasions that the unavailability of damages claims against the defendants in their official capacities did not prevent claims against them in their personal or individual capacities. Majority Opinion at 287–88 n. 10. The judge stated during hearing, "there is no doubt ... [that] in [the defendant's] official capacities money damages cannot be secured against them under the Eleventh Amendment. Absolutely clear and unequivocal. That doesn't mean that there can't be some damages

secured against them in their personal capacities. That point has been very well made also." *Id.* at 287 n. 10. When dismissing the damages claim the court further explained "there is absolutely no way that any damage claim can be collected against either Duckworth of [sic] Cohen [sic] in their official capacities. I underline in their official capacities. And such damage claims are now dismissed. . . . I am not talking about in their individual capacities." *Id.* at 287 n. 10. However, the majority, over-reaching again, feels that the explanations were inadequate because the district court "did not explain to Abdul–Wadood how properly to seek damages from Duckworth and Cohn." *Id.*

In the case of some *pro se* plaintiffs, it possibly might have been advisable for the court to explain in greater depth the distinction between personal and official capacity actions. However, such extended explanation was certainly unnecessary in this case. During the hearing the district court specifically mentioned the fact that Abdul–Wadood had previously been before the same judge in an action against one of the same defendants in the case of *Love v. Duckworth*, 554 F.Supp. 1067 (N.D.Ind. 1983).[4] In that case, decided on January 12, 1983, just seven months prior to the filing of the complaint in this case, the district court, in clear and unambiguous language, noted another closely related difficulty which would preclude recovery of damages even in an individual capacity action, a defendant's lack of personal involvement:

> "[T]he only defendant is the Superintendent, Jack R. Duckworth, against whom plaintiff seeks damages. Therefore, plaintiff must prove personal involvement, or at least a knowing disregard, on the part of the defendant concerning alleged deprivation of constitutionally protected rights. No evidence was proffered which would establish any personal involvement of Defendant Jack Duckworth. Therefore, even were there a violation of some constitutional right, the Defendant could not be found liable. It

is axiomatic that merely being in a supervisory capacity does not render one liable for every action or incident at the institution. Plaintiff has offered no proof of personal involvement, and it would be inconsistent with the personal involvement requirement to hold the Superintendent liable for any act or omission of which he could possibly have been apprised at some time."

554 F.Supp. at 1069 (citations omitted). It is not clear that the majority has read and considered this earlier decision. Nonetheless, where a court's previously published decision has explained to the plaintiff the impropriety of a damages claim against a defendant and where two statements are made at a hearing to exactly the same effect, a court should not be found to have acted improperly in dismissing such a claim. While *pro se* plaintiffs are appropriately given some indulgence in review of their complaints, *see, Hughes v. Rowe*, 449 U.S. 5, 9–10, 101 S.Ct. 173, 175–76, 66 L.Ed.2d 163 (1980), there is no requirement that a court actually aid a plaintiff in pursuing damages claims which have been explained in a previous case and twice in the current case as lacking legal warrant.

In addition, we have held that:

> "Where a complaint alleges that the conduct of a public official acting under color of state law gives rise to liability under Section 1983, we will ordinarily assume that he has been sued in his official capacity and only in that capacity. . . . If a plaintiff intends to sue public officials in their individual capacities or in both their official and individual capacities, he should expressly state so in the complaint."

*Kolar v. County of Sangamon*, 756 F.2d 564, 568–69 (7th Cir.1985) (citations and footnote omitted). I know of no case mandating, even in a *pro se* matter, that a court is required to strain to find a basis for an individual capacity action and a defendant's personal involvement when neither the allegations nor the facts presented on summary judgment materially support an individual capacity action and a defend-

---

**4.** Transcript at 24–26. Abdul–Wadood is also known as Lincoln Love.

ant's involvement. Although a court would not be considered to act improperly if it explained that the plaintiff could amend his action to properly allege an individual capacity action and personal involvement, such action should not generally be required and certainly not in the case of this experienced *pro se* plaintiff who has had the distinction between individual and official capacity suits explained to him in this case and the necessity for allegations of a defendant's personal involvement in another. To require a court to take such measures before it can dismiss an improper damages claim might very well compromise the impartiality required of a tribunal and would place an extreme burden on district court judges who already face great pressures resulting from crowded dockets.

In its discussion of Abdul–Wadood's request for counsel, the majority appropriately holds that "we cannot say that [the district court] abused its discretion at the time it denied counsel." Majority Opinion at 289. However, the majority somehow reasons that it is necessary for the district court on remand " 'to make a fresh determination' [of] whether Abdul–Wadood is entitled to court appointed counsel." *Id.* This action is wholly inappropriate. On remand the district court will consider the same factual situation with the same plaintiff and the same legal issues. As noted earlier, this case is a simple one in which either the strongest or weakest discovery will inevitably lead to the obvious conclusion that the restrictions placed on the plaintiff-appellant Abdul were the direct result of the escape attempt. Since the district court did not abuse its discretion in its initial rejection of counsel, and there are no changes in the relevant factors to be addressed on remand, it is improper and a waste of judicial resources to require the district court to make another determination of this issue.

With respect to the issue of whether Abdul–Wadood was entitled to a lay advocate in his administrative segregation hearing, I agree with the majority's determination that a lay advocate was not constitutionally required. However, I find its discussion of this issue gratuitous and, in effect, an attempt to alter prison regulations by judicial mandate. The majority correctly notes that "we need not decide [the issue of whether Indiana statutes and regulations have created a protected liberty interest in remaining free from the restrictions of administrative segregation], for, even if triggered, the procedural guarantees of the due process clause, as interpreted in *Helms*, do not entitle [Abdul–Wadood] to a lay advocate at his classification hearing." Majority Opinion at 284. However, prior to making this holding the majority indulges in a far-reaching and completely unnecessary discussion of whether the Indiana statutes and regulations, in fact, provide such an interest. *Id.* at 283 n. 3. Essentially the discussion appears designed to cast some doubt on the validity of a prior district court decision that such an interest is not created by these statutes and regulations. In *Shropshire v. Duckworth*, 654 F.Supp. 369, 375 (N.D.Ind.1987), the same district court judge involved in this case held that the Indiana "procedures and policies controlling administrative segregation do not create a liberty interest and do not contain the heavy mandatory language which existed in the Pennsylvania *statutes* which were reviewed in *Hewitt* [*v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) ]." (Emphasis in original). I would remind the majority that:

> "[W]e have recognized that district court decisions construing the law of the state in which it sits are entitled to some deference. We give weight to these decisions because we presume that a district judge is likely to have a special familiarity with the law of the state in which he or she sits."

*Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 (7th Cir.1987) (citations and footnote omitted). Certainly this principle, along with the deference we accord to the decisions of prison administrators, requires us as appellate court judges to abstain from commentary which might be seen as casting doubt on the validity of a district court determination of an important state law issue not properly presented for our review.

The majority's wide-ranging attempt to second-guess actions of Indiana prison administrators is a classic example of why the United States Supreme Court was compelled to warn its subordinate members in the Judicial Branch that

"judicial deference is accorded [decisions of prison administrators] not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."

*Wolfish*, 441 U.S. at 548, 99 S.Ct. at 1879. The majority ignores this directive, and I must dissent.