James Edward SHROPSHIRE, Plaintiff,

v.

Jack R. DUCKWORTH, Steward Miller, and Charles Wright, Defendants.

No. S84–114.

United States District Court, N.D. Indiana, South Bend Division.

Feb. 3, 1987.

James Edward Shropshire, Ind., pro se.

Kermit R. Hillis, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

James Edward Shropshire, petitioner, filed this case against Jack R. Duckworth, Steward Miller, and Charles Wright on February 27, 1984, purporting to allege claims under 42 U.S.C. § 1983 and invoking this court's jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4). This case has been through numerous proceedings as the four pages of docket sheets will well illustrate. On December 12, 1986, the defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and fully complied with the mandates of *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir.1982).

### A.

Recently the Supreme Court of the United States took the opportunity to address Rule 56 of the Federal Rules of Civil Procedure. In two cases decided on the same day, the court has expanded the scope of the application of Rule 56. *See, Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards in which the record is to be analyzed within the stricture of Rule 56.

Based on the decision of the Court in *Celotex,* it is clear that a non-moving party may not rest on its pleadings to avoid summary judgment. *Celotex,* —— U.S. at

——, 106 S.Ct. at 2554. The initial burden is on the moving party to demonstrate " 'with or without supporting affidavits' " the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted in the moving party's favor. *Id.,* 106 S.Ct. at 2553. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.* Further, in *Anderson,* the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. *Anderson,* —— U.S. at ——, 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that the courts analyze summary judgment motions utilizing the standard of proof relevant to that case or issue. *Id.,* 106 S.Ct. at 2512–2513.

### B.

The Supreme Court has recently espoused a measure of conduct in two cases which must be shown before a constitutional infringement protected by 42 U.S.C. § 1983. In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), only those rights directly derived from the Constitution, its Bill of Rights, and Amendments will be protected by 42 U.S.C. § 1983. In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Court reviewed the § 1983 complaint of an inmate who argued that his liberty interest of freedom from bodily injury "without due process of law" within the meaning of the Fourteenth Amendment had been abridged when the jail staff left a pillow case on the jail floor which the plaintiff slipped on resulting in physical injury. At 106 S.Ct. 664, the Court cited its prior holding in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), wherein it held that all which needs to be shown in a § 1983 suit is that a constitutional deprivation occurred and that there is no requirement of a showing of the defendant's "state of mind". The Court concluded that the unintentional loss of a

liberty, a right, property, or the sustaining of a personal injury which is a result of negligent action does not rise to a level which is protected by the Fourteenth Amendment:

> To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries old principle of due process of law.

106 S.Ct. at 665. The Court, at 106 S.Ct. 666, made it clear that only those rights which are traditionally derived from an uncluttered and pristine reading of the Constitution, its Bill of Rights and Amendments will trigger Fourteenth Amendment protection:

> Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States," *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976), quoted in *Parratt v. Taylor,* 451 U.S., at 544, 101 S.Ct. at 1917.

The Court in *Daniels* concluded that the actions of the defendants in leaving a pillow case on the floor did not rise to the level of conduct which implicates the Due Process Clause of the Fourteenth Amendment:

> Where a government official's act causing injury to life, liberty or property is merely negligent "no procedure for compensation is constitutionally required." *Parratt,* 451 U.S. at 548 [101 S.Ct. at 1919] (POWELL, J., concurring in result) (footnote omitted).

106 S.Ct. at 666. The Court emphasized its narrow interpretation of those subject matters which can legitimately claim ancestry in the Constitution:

That injuries inflicted by governmental negligence are not addressed by the United States Constitution is not to say that they may not raise significant legal concerns and lead to the creation of protectable legal interests. The enactment of tort claim statutes, for example, reflect the view that injuries caused by such negligence shall generally be redressed. It is no reflection on either the breadth of the United States Constitution or the importance of traditional tort law to say that they do not address the same concerns. (footnotes omitted).

106 S.Ct. at 666.

In *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), another prison case, the inmate plaintiff filed a § 1983 action against prison administrators alleging that they had abridged his right not to be subjected to cruel and unusual punishment as proscribed by the Eighth Amendment, and his right not to be deprived of personal security without due process of law as protected by the Fourteenth Amendment. Factually, the plaintiff asserted that he had sent a written message to a prison administrator informing the administrator that he had been physically threatened by a fellow inmate and that he feared assault from the inmate whose name was specified. Prison administrators basically ignored the message. The plaintiff was soon thereafter assaulted by the specified inmate by the use of a fork which resulted in wounds to plaintiff's face, neck, head, and body, and caused a broken nose. While citing its decision in *Daniels, supra,* the Court again held that the defendant's inattention to the written message did not rise beyond a level of conduct which could be described as negligent. The Court held that even though serious injury resulted from defendants' conduct, the plaintiff was not protected by the Due Process Clause of the Fourteenth Amendment. *Davidson*, 106 S.Ct. at 670.

The plaintiff in *Davidson* attempted to distinguish and isolate the substantive claim (not to be deprived of personal security) from the procedural claim by arguing that his claim was "purely procedural,"

thus circumventing the requirement that plaintiff must show conduct beyond negligence. The Court reaffirmed that such an argument must fail because the procedural aspect of the Fourteenth Amendment is only triggered if any underlying substantive right is at issue:

> In an effort to limit the potentially broad sweep of his claim, petitioner emphasizes that he "does not ask this Court to read the Constitution as an absolute guarantor of his liberty from assault by the negligence of his jailers." Brief for Petitioner 17. Describing his claim as one of "procedural due process, pure and simple," Id., at 14, all he asks is that New Jersey provide him a remedy. But the Fourteenth Amendment does not require a remedy when there has been no "deprivation" of a protected interest.

*Davidson*, 106 S.Ct. at 670. The Court in *Davidson* concluded that the complaint failed because "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." *Davidson*, 106 S.Ct. at 671.

At least one judge on our Court of Appeals has summarized: "Negligence is not itself actionable. *Daniels v. Williams* [474 U.S. 327], 106 S.Ct. 662 [88 L.Ed.2d 662] (1986)." *Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir.1986). *See also Bodine v. Elkhart County Election Board*, 788 F.2d 1270, 1272 (7th Cir.1986) and *Rascon v. Hardiman, et al*, 803 F.2d 269 (7th Cir.1986).

## II.

### A.

This court has before it elaborate information through affidavits and documents that essentially boil down to a fairly simple fact situation in the context of *pro se* prisoner litigation under § 1983. For other published legal history regarding this plaintiff see *Shropshire v. State*, 501 N.E.2d 445 (Ind.1986), and *Resnover, Shropshire et al. v. State*, 267 Ind. 597, 372 N.E.2d 457 (1978). The plaintiff was transferred to the Indiana State Prison from the Indiana

Reformatory about February 9, 1981. The transfer is now admitted to have been non-disciplinary. When plaintiff arrived at the Indiana State Prison it was at first erroneously believed that such transfer had been disciplinary but when copies of the transfer authority arrived in the unit later on the same day, it was determined that the transfer was not disciplinary and he, the plaintiff, was immediately removed from disciplinary status. The plaintiff had been incarcerated at the Indiana State Prison at least on one previous occasion was then suspected of involvement in a work stoppage. The defendants' claim, and it is not seriously disputed, that a work stoppage in a maximum security institution such as the Indiana State Prison is a direct threat to the security of that institution and can be a very serious situation. On February 14, 1984, the plaintiff was notified in writing that he would appear before the classification committee for consideration of placement on Administrative Segregation. He was specifically advised as follows:

> You are being asked to appear before the Classification Committee on Friday, February 17, 1984 because it is felt that there is a need for significant change in your Program. In the event you are re-classified, you may be placed on an Administration Segregation Treatment Program. When you appear before the Classification Committee, you may speak in your own behalf, present documentary information, call witnesses and you may have a lay advocate present if you so desire. Was released from disciplinary status on February 9, 1984.

Plaintiff signed the aforesaid document and a hearing was held before the Classification Committee on February 17, 1984. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) forecloses any claim that this plaintiff may have with reference to inter-institutional transfers as does its companion case, *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). *See also Caldwell v. Miller,* 790 F.2d 589 (7th Cir.1986), and *Huggins v. Isenbarger,* 798 F.2d 203 (7th Cir.1986). There is no Indiana statute that has been cited to this court or that is known by this court, to create any liberty interest in inmate transfers from one institution to another. This court has been made aware of a portion of the Department of Corrections' policy regarding inter-institutional transfers which went into effect at the Indiana State Prison on April 1, 1984. It had previously been implemented by the Department of Corrections on October 1, 1983. Prior to the implementation and effective date of the aforesaid Department of Corrections' policy, there were no guidelines and prisoners were transferred between institutions at the discretion of the head of those institutions or at the discretion of the Director of Placement Services of the Indiana Department of Corrections. The aforesaid policy does allow an inmate to appear at a hearing and give reasons why he would prefer not to be transferred. However, this document does not create a liberty interest and does not substantially restrict the ability of prison officials and the Indiana Department of Corrections from transferring inmates from one institution nor to another. Neither does it predicate such transfers on misconduct. This policy *may* have created a procedural due process right but certainly does not and has not created a liberty interest triggering the protection of the Fourteenth Amendment.

In either event under the teaching of the twin cases of *Davidson* and *Daniels,* both decided January 21, 1986, there would be no basis for a violation based on simple negligence and it would be incumbent upon this plaintiff to allege and prove either deliberate indifference or a reckless disregard for his rights analogous to his obligation under the Eighth Amendment of the Constitution of the United States as defined in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There is no factual basis in this record that would permit any inference of anything beyond negligence in the conduct of any defendant here. On this subject compare *Burris v. Kirkpatrick,* 649 F.Supp. 740 (N.D.Ind.

1986), and *Musgrove v. Broglin*, 651 F.Supp. 769 (N.D.Ind.1986).

### B.

■ It is also readily apparent that any damage claims against any of these three defendants in their official capacities must be dismissed under the Eleventh Amendment of the Constitution of the United States as defined in *Pennhurst School and Hospital Corp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and more recently by the Court of Appeals of this circuit in *Darryl v. Coler*, 801 F.2d 893 (7th Cir.1986), Part III B at page 906.

The late Justice Stewart, speaking for the Court of Appeals in this circuit, in *Owen v. Lash*, 682 F.2d 648 (7th Cir.1982), clearly ruled that the Warden of the Indiana State Prison was immune from damage claims in his official capacity under the Eleventh Amendment of the Constitution of the United States.

Thus, any damage claims as against any of these three defendants in their official capacities are foreclosed.

### C.

It would appear that the principal thrust of plaintiff's complaint is his placement in administrative segregation upon his arrival at the Indiana State Prison in February, 1984. Administrative segregation is a status of confinement resulting by the assignment by the Classification Committee rather than by a Conduct Adjustment Board, the latter of which must conduct its proceedings in accord with the mandate of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Indiana State Prison as a maximum penal institution places inmates in the status of administrative segregation if their continued presence in the general population of the institution would pose a threat either to the inmates or to the security of the institution or where behavior or actions of the inmate are believed to cause a threat to the security or orderly operation of the institution.

■ The Supreme Court dealt with this subject in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). There, Helms was a prisoner in Pennsylvania who was removed from his cell and from the general population for questioning following a disturbance at that particular Pennsylvania institution. After this interview Helms was placed in an restrictive confinement and a misconduct report was ultimately filed against him. Following a review by what appears to be a Conduct Adjustment Board, it was found that that board could not determine guilt due to insufficient information and ordered that Helms' confinement in restricted housing be continued. The next month the Program Review Committee, which consisted of three prisoner officials was convened and the Committee met to review the status of Helms' confinement in administrative segregation and to make recommendations as to his future. That Committee unanimously concluded that Helms should remain in administrative segregation and affidavits of the Committee members said that the decision was based on several related concerns and that Helms was seen as a danger to staff and other inmates if released back into the general population. The Superintendent of the institution personally reviewed the Program Review Committee's determination and concurred in its recommendation. The district court and the Court of Appeals held that Helms had a protected liberty interest in remaining in the general population of that prison which had been created by state regulations and that the hearing at which Helms was classified to administrative segregation must comply with the mandates of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Supreme Court of the United States agreed with the Third Circuit Court of Appeals that the Pennsylvania *statutory* framework governing the administration of state prisons gave rise to a liberty interest but concluded that the procedures afforded a respondent here were sufficient due process under the Fourteenth Amendment. (Parenthetically,

it should be emphasized here that *Helms* does predate *Daniels* and *Davidson* by approximately three years.) It is correct that any interest that an inmate may have in being in the general population rather than in administrative segregation arises only under state law and not directly from the Due Process Clause of the Fourteenth Amendment. The Supreme Court of the United States declined to make a blanket ruling that the regulations in question in all states *per se* created a liberty interest. The principal thrust of the Supreme Court's opinion in *Helms* is that the procedural guidelines in Pennsylvania used mandatory language that created more than just procedural rights.

In a case predating *Hewitt v. Helms* this court dealt with the same due process requirements regarding administrative segregation proceedings in *Owen v. Heyne*, 473 F.Supp 345 (N.D.Ind.1978), *aff'd*, 605 F.2d 559 (7th Cir.1979), *cert. denied*, 444 U.S. 1090, 100 S.Ct. 1054, 62 L.Ed.2d 778 (1980). For post-*Hewitt v. Helms* cases in this circuit *see also Campbell v. Miller*, 787 F.2d 217 (7th Cir.1986).

In Indiana, unlike Pennsylvania, the statutes do *not* address administrative segregation. The controlling standards are those established in DOC policy 02–03–101 which is set out in Appendix A attached hereto * and by a standard operating procedure entitled "Administrative Segregation Procedure" which are a part of the record in this case. These procedures and policies do not create a liberty interest and do not contain the heavy mandatory language which existed in the Pennsylvania *statutes* which were reviewed in *Hewitt*.

The procedures here established meet the minimum requirements of due process as established in *Hewitt v. Helms*. *Hewitt* provides that the inmate is entitled only to a non-adversarial hearing "within a reasonable time after confining him to administrative segregation." Helms received such a hearing within five days after being placed in administrative segregation. This plaintiff received his hearing on February 17, 1984, within eight days of being placed in administrative segregation. This plaintiff received notice of the hearing on February 14, 1984, three days prior to the hearing and was permitted to be present throughout the hearing, except during deliberations. This plaintiff was permitted to speak on his own behalf and was permitted to present evidence, call witnesses and have a lay advocate. This plaintiff elected to be assisted by a lay advocate and was in fact, assisted by a lay advocate of his cwn choice. This described procedure is certainly consistent with the standards announced in the *Hewitt* case.

Following the hearing, the classification committee recommended that the plaintiff be placed in Administrative Segregation and that he be reviewed every thirty days. Superintendent Duckworth approved this recommendation on February 23, 1984 and a copy of the classification committee's memorandum was provided to the plaintiff. On March 2, 1984, the plaintiff met with the Unit Team which informed him again that he was referred to and approved for administrative segregation due to his suspected attempt to organize a work stoppage the last time he was at the Indiana State Prison. On March 13, 1984, John Barnes, on behalf of the Classification Committee, wrote a letter to the plaintiff which explains the reasons for the Committee's actions. It would appear that these actions are certainly consistent with the standards announced in *Hewitt v. Helms*. This reading of *Hewitt v. Helms* is consistent with that in *Mathews v. Fairman*, 779 F.2d 409 (7th Cir.1985).

There are also materials before the court in the record that indicate that the plaintiff was believed to have been involved in attempting to create a disturbance at the prison during his earlier tenure there. This compares to the suspicions that the Pennsylvania authorities had about Helms. The officials at the Indiana State Prison apparently believed that if housed in the general population, plaintiff would pose a

---

\* Appendix A is attached only to the original of the Memorandum and Order.

threat to the institutional routine and to the security of the institution. This is one of the explicit reasons sanctioned by the standard operating procedures for placing inmates at the Indiana State Prison. It is also one of the reasons specifically affirmed by the Supreme Court of the United States in *Hewitt v. Helms*. It is important to note that under Indiana procedure confinement in administrative segregation is dissimilar to disciplinary confinement especially since the latter does not affect parole opportunities. This plaintiff is no longer confined at the Indiana State Prison and was transferred to the Indiana State Farm at Putnamville, Indiana, on March 6, 1985. Therefore, any injunctive issues that the plaintiff has previously raised in this case or attempted to raise are now moot.

The plaintiff became eligible for parole in May, 1985, after his transfer to the Indiana State Farm and was heard by the Indiana Parole Board in May, 1985, and in May, 1986. Parole was denied on both occasions. On each occasion the denial was not for institutional conduct although such is one of the items that can be considered by the Parole Board under the laws of Indiana.

### D.

■ Apparently this plaintiff is also attempting to argue lack of access to the courts under the constitutional constraints of *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The record in this case indicates that this plaintiff has had an abundant access to this court in this case as well as other courts and there is no indication of any violation of that due process right.

This court is all too familiar with the constraints that are placed on it by the mandates of *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). This court is also fully aware that even under the *Celotex* and *Liberty Lobby* cases cited above that the record must still be examined in the light most favorable to the plaintiff before a judgment can be entered under Rule 56 of the Federal Rules of Civil Procedure. However, this record, which is massive, leads this court solely to the conclusion that as matter of law the three defendants here are each and all entitled to judgment.

Judgment is entered for the defendants, Duckworth, Miller and Wright, and against the plaintiff, Shropshire. Costs are assessed against the plaintiff, Shropshire.

IT IS SO ORDERED.