James GORMAN, Plaintiff,

v.

Darlene MOODY, Mail Room Supervisor; G. Michael Broglin, Superintendent; and John T. Shettle, Defendants.

James GORMAN, Plaintiff,

v.

G. Michael BROGLIN, Defendant.

Civ. Nos. S 87–59, S 87–60.

United States District Court,
N.D. Indiana,
South Bend Division.

April 13, 1989.
As Corrected May 19, 1989.

James Gorman, South Bend, Ind., pro se.

David A. Nowak, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

On February 9, 1987, *pro se* plaintiff, James Gorman, filed this suit purporting to state a claim under 42 U.S.C. § 1983. On February 27, 1987, the defendants filed a motion to dismiss which was partially granted and partially denied pursuant to a Memorandum and Order of this court dated April 22, 1987.

On November 5, 1987, a pretrial conference was held and this court entered an order converting the defendants' motion to dismiss to a motion for summary judgment. The plaintiff was given until May 16, 1988, to respond to the defendants' motion. The plaintiff has not responded, nor has the plaintiff asked for an enlargement of time in which to answer. This matter is now ripe for ruling.

### II.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure (Fed.R.Civ.P. 56); *accord Arkwright–Boston Mfg. Mutual Ins. Co. v. Wausau Paper Mills Co.,* 818 F.2d 591, 593 (7th Cir.1987). A material question of fact is a question which will be outcome-determinative of an issue in that case. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir.1984).

Recently the Supreme Court of the United States took the opportunity to address Rule 56, Fed.R.Civ.P. In two cases, decided on the same day, the Court expanded the scope of the application of Rule 56. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and *Anderson* addressed the standards under which the record is to be analyzed within the structure of Rule 56.

After *Celotex* it is clear that a non-moving party may not rest on its pleadings to avoid summary judgment. 106 S.Ct. at 2554. *See also Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987). The initial burden is on the moving party to demonstrate " 'with or without supporting affidavits' " the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted in the moving party's favor. *Celotex,* 106 S.Ct. at 2553 (quoting Rule 56). Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine [material] issue for trial.' " *Id.* Furthermore, in *Anderson,* the Court held that what facts are material in a specific case shall be determined by the substantive law controlling that case or issue. 106 S.Ct. at 2510. In addition, the Court went on to interpret Rule 56 as requiring that the courts analyze summary judgment motions utilizing the standard of proof relevant to that case or issue. *Id.* at 2512–2513. For recent academic insight into *Celotex* and *Anderson,* see Childress, *A New Era For Summary Judgments: Recent Shifts at the Supreme Court,* 116

F.R.D. 183–194 (1987). At page 194 thereof, the author states:

The recent Supreme Court cases likely require that summary judgment be more readily granted.... This emerging trend signals a new era for summary judgments, one in which the old presumptions are giving way to a policy of balancing and efficiency, and the mechanism is more appropriate to double as a sufficiency motion—allowing some sort of trial itself on the paper record.

For the judicial epilogue of *Celotex,* see *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33 (D.C.Cir.1987). A recent object lesson applying these ideas is found in *Richardson v. Penfold,* 839 F.2d 392 (7th Cir.1988). For an exact and recent analysis on this subject, see Friedenthal, *Cases on Summary Judgment: Has There Been a Material Change in Standards?* 63 Notre Dame L.Rev. 770 (1988).

### III.

### A. FACTS

The plaintiff's first complaint presents the novel issue of whether an incarcerated person's Eighth and Fourteenth Amendment rights are violated when a correctional facility fails to segregate smokers from nonsmokers, and according to the plaintiff, the facility forces him "to suffer the discomfort and consequences of second-hand smoke."

The plaintiff, a lifelong nonsmoker, was incarcerated at the Westville Correctional Center (WCC) from September 13, 1984 to February 10, 1985. During the plaintiff's incarceration he had nine (9) roommates, of whom eight (8) were smokers. The plaintiff alleges that the failure of WCC to provide smoking and nonsmoking dormitories caused him to suffer physical, emotional, and mental injury.

■ The plaintiff's complaint requests injunctive relief, compensatory and punitive damages. As an initial matter, the plaintiff's request for injunctive relief must be denied. Under Article III of the United States Constitution, litigants may invoke the jurisdiction of the federal courts only by alleging an actual case or controversy. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). A plaintiff must demonstrate that he has "a personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper resolution of constitutional questions. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ Past exposure to illegal conduct does not "in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495–496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). As *O'Shea* makes clear, standing to seek an equitable remedy depends on a showing of a "real and *immediate* threat of *repeated* injury." *Id.* at 496, 94 S.Ct. at 676 (emphasis added); *City of Los Angeles v. Lyons,* 461 U.S. 95, 110, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983); *Buie v. Jones,* 717 F.2d 925, 928 (4th Cir.1983). This requirement cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again. *O'Shea,* 414 U.S. at 502, 94 S.Ct. at 679.

The plaintiff in this case is not presently incarcerated and is, therefore, without a "personal stake in the outcome" of his challenge to the conditions at the WCC. Even if this court were to order wholesale structural changes at WCC, those changes would have no effect on the plaintiff. Even if the past conduct was illegal, the plaintiff has not alleged, nor does the record reflect, any "present, continuing, adverse effect" on the plaintiff. The plaintiff's request for injunctive relief is DENIED.

As noted earlier, this complaint raises a novel issue. Research by this court has located only one reported case [1] where a prisoner who did not have a pre-existing medical condition sued prison officials in order to compel the creation of smoking and nonsmoking areas within the prison.

1. *Avery v. Powell,* 695 F.Supp. 632 (D.N.H.1988).

For the reasons set forth below, this court respectfully disagrees with the District Court of New Hampshire and finds that the plaintiff has failed to state a claim upon which relief can be granted.

## B. EIGHTH AMENDMENT

The authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments, but they made no attempt to define the contours of that prohibition. As the court in *Ollman v. Evans*, 750 F.2d 970, 995–996 (D.C.Cir.1984), stated:

> Judges given stewardship of a constitutional provision ... whose core is known but whose outer reach and contours are ill-defined, face the never-ending task of discerning the meaning of the provision from one case to the next. There would be little need for judges—and certainly no office for a philosophy of judging—if the boundaries of every constitutional provision were self-evident.

Although the outer reaches of the Eighth Amendment have not been defined, judges have been guided by the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). In determining whether to uphold an Eighth Amendment challenge to prison conditions, courts must consider whether the totality of the circumstances violates "contemporary standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The individual judge must not apply his own subjective view of what is cruel and unusual. Rather, his judgment "should be informed by objective factors to the maximum possible extent." *Rhodes*, 452 U.S. at 352, 101 S.Ct. at 2402.

Times change, and what may not have been considered cruel and unusual punishment one hundred years ago or even twenty years ago may be so considered today. However, lawful incarceration brings about the necessary withdrawal of privileges enjoyed by society at large. Although there is no doubt that prisoners must be provided with basic human needs,

*Harris v. Fleming*, 839 F.2d 1232 (7th Cir. 1988), and penal conditions may not "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), inmates cannot expect the "amenities, conveniences, and services of a good hotel." *Harris*, 839 F.2d at 1235.

The usual prisoner Eighth Amendment case involves either a prisoner upon prisoner assault or an allegation that prison officials failed to provide medical services to a prisoner. In those types of cases the "deliberate indifference" standard is used. The most recent decision on this subject is *Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988). In that regard, Judge Grant, speaking for the court, stated:

> Originally designed to protect federal prisoners from barbarous treatment at the hands of their jailors, the Eighth Amendment prohibition against cruel and unusual punishment has been expanded under the Due Process Clause of the Fourteenth Amendment to impose upon both federal and state correctional officers and officials the obligation to take reasonable steps to protect inmates from violence at the hands of other inmates. *See Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984); *Archie v. City of Racine*, 847 F.2d 1211, 1222–23 (7th Cir.1988) (en banc); *Richardson v. Penfold*, 839 F.2d 392, 395 (7th Cir.1988); *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir.1988); *Duckworth v. Franzen*, 780 F.2d 645, 651 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). When a correctional officer or prison official *intentionally* exposes a prisoner to a known risk of violence at the hands of another prisoner, he breaches the duty imposed upon him and deprives the victim of the security to which he is constitutionally entitled, and thus subjects himself to suit under 42 U.S.C. § 1983. *Smith–Bey v. Hospital Administrator*, 841 F.2d 751, 758 (7th Cir.1988); *Richardson*, 839 F.2d at 394–95; *see also Duckworth*, 780 F.2d at 652. *Negligence or even gross negligence on the part of a prison official will not establish a*

constitutional violation. *Daniels v. Williams,* 474 U.S. 327, 332–33, 106 S.Ct. 662, 665–66, 88 L.Ed.2d 662 (1986); *Smith–Bey,* 841 F.2d at 759; *Duckworth,* 780 F.2d at 653. The official's actions must be deliberate or reckless in the criminal sense. *Duckworth,* 780 F.2d at 652–53. *See also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) ("only the 'unnecessary and wanton infliction of pain' ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment"); *Archie,* 847 F.2d at 1222 ("the state must protect one prisoner from another, at least when it acts (or stands by) deliberately or with indifference to the prisoner's plight"). Recklessness, in the pertinent sense, "implies an act so dangerous that the defendant's knowledge of the risk can be inferred," *Duckworth,* 780 F.2d at 652, and reflects an extreme or complete indifference to the value of human life. *Archie,* 847 F.2d at 1219. (Footnote omitted.)

In regard to the deliberate indifference standard, Judge Nordberg in *Santiago v. Lane,* 697 F.Supp. 300, 303 (N.D.Ill.1988) stated:

> The Seventh Circuit has therefore required prison inmates to show that defendant prison officials, guards, and other prison employees acted with "deliberate indifference" to the inmate's need for protection. Exactly what amounts to "deliberate indifference" is not perfectly settled. *Compare Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985) (criminal recklessness), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986) *with Benson v. Cady,* 761 F.2d 335, 339–40 (7th Cir.1985) (gross negligence); *see, e.g., Richardson, 839 F.2d at 394–95 (citing both* Duckworth *and* Benson, *and applying* Benson*'s gross negligence standard).*
>
> There is considerable doubt whether *Benson* 's gross negligence standard should apply. *Duckworth* fully explains why gross negligence is not enough to

constitute punishment (let alone cruel and unusual punishment), 780 F.2d at 652–53, and the Supreme Court has approvingly cited to *Duckworth* for its criminal recklessness standard. *Whitley,* 106 S.Ct. at 1085; *see Childers v. Lane,* No. 85 C 7770 [1988 WL 45503] (N.D.Ill. May 2, 1988) (LEXIS, Genfed library, Dist. file) (discussing *Whitley* and *Duckworth* ). Nevertheless, because the Seventh Circuit has most recently applied the *Benson* gross negligence standard, *Richardson,* 839 F.2d at 395, and because this Court finds that the decision on defendants' motion will not be affected by the difference between the standards, the Court will apply the *Benson* gross negligence standard to the facts in this case. (Footnote omitted.)

\*　　\*　　\*　　\*　　\*　　\*

Despite some confusion as to what amounts to deliberate indifference, this court believes that standard is appropriate here because in essence the plaintiff seeks redress for the "violence" caused him by fellow prisoners. However, because smoking by one prisoner in close proximity to another prisoner can hardly be construed as an assault—because it lacks the requisite intent—the plaintiff in this case must be able to show the most deliberate indifference on the part of prison officials. To succeed in this burden, this court believes that the plaintiff must show that prison officials intentionally exposed him to a known risk of harm and actually intended to harm him. *See Simpson v. Broglin,* 612 F.Supp. 1162 (N.D.Ind.1985).

## C. ENVIRONMENTAL TOBACCO SMOKE AND THE EIGHTH AMENDMENT

Although as early as 1647 statutes were passed and repealed which regulated or prohibited tobacco smoking,[2] the story of modern anti-smoking regulation and the effects of smoking on the human body begins

---

**2.** *See* Comment, *Smoking in Public: This Air is My Air, This Air is Your Air,* 1984 S.ILL.U.L.J. 665.

with the 1964 United States Surgeon General's Report on Smoking and Health.[3] In that historic report the Surgeon General concluded that smoking was a "health hazard of sufficient importance in the United States to warrant appropriate remedial action." In response to the 1964 Report Congress enacted the "Cigarette Labeling and Advertising Act of 1966" which required, among other things, a health warning on each pack of cigarettes.[4] In 1969 the previous warning label was revised with passage of the "Public Health Cigarette Smoking Act" (PUB.L. 91–222). The revised warning label deleted the word "may" and inserted "is dangerous" to your health.

In 1971 the Federal Communications Commission became involved in the debate over smoking when it became unlawful to advertise cigarettes and little cigars on any medium of electronic communication which was subject to the jurisdiction of the FCC. 15 U.S.C. § 1353. Congress' most recent activity in this area was the "Comprehensive Smoking Education Act of 1984," (codified at 15 U.S.C. § 1333).[5]

Although the evidence is overwhelming as to the harmful effects of smoking, it was the 1986 Surgeon General's Report entitled "The Health Consequences of Involuntary Smoking"[6] which caused serious concern to nonsmokers. After an examination of the available evidence the Surgeon General reached the conclusion that "involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers." This report confirmed what many nonsmokers had long suspected and feared, that their exposure to environmental tobacco smoke (ETS) (more commonly referred to as second-hand smoke), was harmful to their health.

As a result of the research on the effects of smoking and exposure to second-hand smoke, all but nine states have enacted laws regulating smoking in at least one public place. Since 1980 more than 80 cities and counties have enacted smoking laws, and approximately 35 percent of businesses have adopted smoking policies.[7] It is interesting to note, however, that as of 1986 only two states had statutes which allowed a warden, in his discretion, to establish smoking and nonsmoking areas within a prison. The Federal Bureau of Prisons allows, but does not mandate, wardens to establish smoking/no smoking areas. 28 C.F.R. § 551.160.

Several courts have dealt with the rights of smokers and nonsmokers. Although they are not on point, they are instructive. In *Gasper v. Louisiana Stadium and Exposition District*, 418 F.Supp. 716 (E.D.La. 1976), *aff'd*, 577 F.2d 897 (5th Cir.1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40 (1979), nonsmokers filed suit against the Louisiana Superdome, under 42 U.S.C. § 1983, alleging that their constitutional rights had been violated by the superdome's policy of permitting patrons to smoke within the superdome. The District Court held that the plaintiffs had failed to state a claim upon which relief could be granted.

In *Kensell v. State of Oklahoma*, 716 F.2d 1350 (10th Cir.1983), the court held that the Constitution does not empower the federal judiciary to impose nonsmoking rules in the workplace. The court further held that "to do so would support the most extreme expectations of the critics who

---

3. Public Health Service, U.S. Department of Health, Education and Welfare, *Smoking and Health* (1964) [hereinafter cited as 1964 Report].

4. The warning read, "Caution: Cigarette smoking may be hazardous to your health."

5. The new, required warnings read as follows:
   **Surgeon General's Warning:** Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy.
   **Surgeon General's Warning:** Quitting Smoking Now Greatly Reduces Serious Risks to Your Health.

**Surgeon General's Warning:** Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, and Low Birth Weight.
**Surgeon General's Warning:** Cigarette Smoke Contains Carbon Monoxide.

6. Public Health Service, U.S. Department of Health, Education and Welfare, The Health Consequences of Involuntary Smoking (1986).

7. *Id.*

fear the federal judiciary as a superlegislature promulgating social change under the guise of securing constitutional rights". *Id.* at 1351.

In *Franklin v. State of Oregon, State Welfare Division,* 662 F.2d 1337 (9th Cir. 1981), the Court of Appeals reversed the District Court's dismissal of a prisoner's complaint. The plaintiff had alleged that placing him in a cell with a heavy smoker of cigarettes caused serious danger to his health because of his throat tumor. The Court of Appeals held that if the conditions were as threatening to the plaintiff's health as he alleged and if they were the result of deliberate indifference on the part of prison officials, then the plaintiff arguably had alleged cruel and unusual punishment. *Id.* at 1347. Similarly, in *Beeson v. Johnson,* 668 F.Supp. 498 (E.D.N.C.1987), the court denied the defendant's motion for summary judgment in a case where the plaintiff had three health conditions which were greatly exacerbated by environmental tobacco smoke, and prison doctors recommended that the plaintiff be housed in a nonsmoking area.

Both *Franklin* and *Beeson* are distinguishable from Mr. Gorman's claims because he has not alleged that exposure to second-hand smoke exacerbated a previously diagnosed serious medical condition.

■ This court believes that smoking is a societal issue best resolved by the executive and legislative branches of government. The operation of our correctional facilities is "peculiarly the province of the legislative and executive branches of our government, not the judicial." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The role of the federal courts is to enforce constitutional standards without assuming superintendence of prison administration. *Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir.1981) (en banc), *cert. denied,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981). As the plaintiff pointed out in his complaint, the effects of second-hand smoke have just recently become known. Society at large is presently argu-

ing the issue of whether smoking should be permitted in public areas. Because the Eighth Amendment draws its meaning from the evolving standards of decency in society as a whole, it is particularly relevant that this society cannot yet completely agree on the propriety of nonsmoking areas and a smoke-free environment.

As our society moves toward a so-called smoke-free environment and new laws are enacted, there may come a time when the "evolving standards of decency that mark the progress of society" demand a smoke-free environment in a prison setting. However, this is not the case now nor was it at the time of the plaintiff's incarceraton. Whether to provide smoke-free areas must be left to the discretion of legislatures and prison officials who must operate the prisons to the best of their abilities, and those officials must make those decisions after a consideration of all factors relevant to the particular institution and the care and well-being of all inmates.

The plaintiff has raised an important issue, but that issue needs to be resolved by the Indiana General Assembly and Indiana prison officials, not by this court acting in its capacity as a member of the federal judiciary.

It should be briefly noted that even if failure to provide a smoke-free environment does constitute cruel and unusual punishment, the plaintiff has failed to offer *any* evidence that the defendants intended to harm him.

### D. DUE PROCESS

The plaintiff has also claimed that his exposure to ETS is a violation of due process. Judge Cummings for the Seventh Circuit recently stated the test which a plaintiff must satisfy in order to invoke the due process protections of the Fourteenth Amendment:

Prisoners claiming a due process violation under the Fourteenth Amendment must demonstrate that they have been deprived of a protected liberty or property interest by arbitrary government action. *Meachum v. Fano,* 427 U.S. 215, 223–224, 96 S.Ct. 2532, 2537–2538, 49

L.Ed.2d 451 [1976]. These interests may arise from the Constitution, see *Vitek v. Jones*, 445 U.S. 480, 493–494, 100 S.Ct. 1254, 1263–1264, 63 L.Ed.2d 552 [1980]; cf. *Newbury v. Prisoner Review Board*, 791 F.2d 81, 85 (7th Cir.1986), statutes, see *Greenholtz v. Inmates of Neb. Penal & Correctional Complex*, 442 U.S. 1, 7–11, 99 S.Ct. 2100, 2103–2106, 60 L.Ed.2d 668 [1979]; *Walker v. Prisoner Review Board*, 769 F.2d 396, 400 (7th Cir.1985), certiorari denied, 474 U.S. 1065, 106 S.Ct. 817, 88 L.Ed.2d 791 [1986]; but see *Harris v. Fleming*, 839 F.2d 1232 (7th Cir.1988) (prisoners ordinarily have no liberty or property interests in receiving or retaining a job while in prison); *Toney–El v. Franzen*, 777 F.2d 1224, 1226–1227 (7th Cir.1985) (where state remedies are adequate, inmate has no constitutionally protected liberty interest in early release despite state statute affording good time credits), certiorari denied, 476 U.S. 1178, 106 S.Ct. 2909, 90 L.Ed.2d 994 [1986], and administrative regulations, see *Hewitt v. Helms*, 459 U.S. 460, 471–472, 103 S.Ct. 864, 871–872, 74 L.Ed.2d 675 [1983]; *Fleury v. Clayton*, 847 F.2d 1229, 1230-1232 (7th Cir.1988); cf. *Mathews v. Fairman*, 779 F.2d 409, 414–415 (7th Cir.1985) (regulation on administrative transfers did not limit official discretion and did not create protected liberty interest). See generally *Caldwell v. Miller*, 790 F.2d [589] at 602 [7th Cir.1986].

*Williams v. Lane*, 851 F.2d 867, 879–80 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). Liberty interests protected by the Fourth Amendment, therefore, originate either in the Constitution or under state laws. *See Vitek, supra* and *Greenholtz, supra.*

The plaintiff is contending that Indiana has created a liberty interest protected by the Due Process Clause through its enactment of the "Clean Indoor Air Law." I.C. 13–1–13–1 *et seq.* The Clean Indoor Air Act makes it an infraction for a person to smoke in an area designated as a nonsmoking area. I.C. 13–1–13–5(a) states that the official in charge of a *public building shall* designate a nonsmoking area and *may* designate a smoking area in the building (emphasis added).

A "public building" is defined in I.C. 13–1–13–2 as follows:

Sec. 2. As used in this chapter, "public building" means an enclosed structure or the part of an enclosed structure that:

(1) is occupied by any agency of state or local government;

(2) is used as a classroom building at a state educational institution as defined in I.C. 20–12–0.5–1(b);

(3) is used as a public school as defined in I.C. 20–10.1–1–2; or

(4) is licensed as a health facility under I.C. 16–10–1 or I.C. 16–10–4.

In order for the state to create a liberty interest protected under the Fourteenth Amendment, the state must use "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed and that [the challenged action or inaction, as the case may be, of prison authorities] will not occur absent specified substantive predicates...." *Hewitt v. Helms*, 459 U.S. 460, 471–472, 103 S.Ct. 864, 871–872, 74 L.Ed.2d 675 (1983). "The test for whether a statutory or regulatory procedure creates a protectable due process interest, then, hinges on the actual language used by the legislature or agency." *Cain v. Lane*, 857 F.2d 1139, 1144 (7th Cir.1988). *See also Culbert*, 834 F.2d at 628 (no liberty interest created by permissive rather than mandatory language).

This court is unable to find the requisite mandatory language in Indiana's Clean Indoor Air Act which would create a protected liberty interest. The Act's definition of "public building" does not specifically include correctional institutions. The Act's language is also tempered by I.C. 13–1–13–8, which allows the state board of health to waive various provisions of the Act. Finally, it should be noted that prisons have never been thought of as public buildings or public forums. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577, 100 S.Ct. 2814, 2827, 65 L.Ed.2d 973 (1980) (Prisons, by definition, are not

open or public places.); *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 137, 97 S.Ct. 2532, 2544, 53 L.Ed.2d 629 (1977) (Prison is "most emphatically not a public forum."); *U.S.S.W. Africa/Namibia Trade and Cult. Coun. v. U.S.*, 708 F.2d 760, 763 (D.C.Cir.1983).

The failure of Indiana's Clean Indoor Air Act to *specifically* include correctional facilities is far from the "heavy mandatory language which existed in the ... *statutes* which were reviewed in *Hewitt.*" *Shropshire v. Duckworth*, 654 F.Supp. 369, 375 (N.D.Ind.1987) (emphasis in original) and therefore cannot be deemed to have created a protected liberty interest.

### IV.

The plaintiff's second complaint attempts to state a claim regarding the plaintiff's constitutional rights to mail personal and legal materials out of the institution. Plaintiff states three separate sets of facts each of which allegedly constitute a constitutional violation.

The first claim is contained in a grievance signed by the plaintiff on November 20, 1984. Plaintiff alleges that, on October 9, 1984, he sent, by certified mail, documents to the Department of Public Welfare in South Bend, Indiana. As of the date of the grievance, November 20, 1984, plaintiff had not received the green card receipt indicating that the mail had in fact been delivered. Similarly, on November 7, 1984, plaintiff sent a letter to Cloid Shuler of the Indiana Department of Corrections, and on November 15, 1984, plaintiff sent a letter to Gordon Faulkner of the Indiana Department of Corrections. Both letters were sent by certified mail and the plaintiff complains that he did not receive a receipt for the mailings as of November 20, 1984.

Also attached to the grievance are copies of the green certified mail receipts. These documents indicate that the Department of Public Welfare did in fact receive plaintiff's correspondence, although the date of receipt cannot be ascertained. Cloid Shuler's correspondence was apparently mailed on November 20, 1984 and received by Shuler on November 27, 1984.

Plaintiff filed his grievance on November 20, 1984 and mailroom personnel responded to the grievance on November 26, 1984 by stating:

All certified mail is logged in a book in the WCC mailroom (both out-going and incoming). We show one certified going to Child Welfare Services on October 23, 1984; another going to Shuler on November 20, 1984 and we do *not* show one going to Faulkner on November 15, 1984. If you did not have money in your account in the Business Office, they cannot write a check to cover your remittance slips. This we cannot check for you. We also note in our log when your green card comes back into the WCC mailroom showing it was received on the other end. We do not show this date so cannot tell you if your letter was ever received at the place you sent them.

From the evidence submitted by plaintiff, it is evident that two of the three items of mail were mailed and received. The third item was apparently lost and plaintiff was promptly advised of this fact when he filed his grievance. Apparently, plaintiff is complaining of the delay in mailing the documents between the time he submitted the certified mail item for mailing and when it was actually mailed.

In an affidavit submitted with the defendant's motion, Darlene Moody, the mailroom supervisor at WCC, described the procedure whereby an inmate may send mail by certified mail and describes why such mail is not mailed on the date it is received by the mailroom staff. Upon receipt of an item to be sent by certified mail, the inmate is notified of the cost of sending the item. The item is then held until the cost of sending the item is covered. The inmate, once notified of the cost, must process a remittance slip whereby the money to cover the cost of mailing the item is deducted from the inmate's trust account. Upon receipt of a properly authorized remittance slip, the item is placed in the mail. The process of obtaining the funds necessary to cover the cost of the mailing can take several days depending upon how promptly the paperwork is completed. The mailroom

held plaintiff's certified mailings until it received notice that plaintiff had the funds available to cover the cost of the mailing.

The second factual basis for plaintiff's cause of action is contained in a grievance form attached to the complaint dated November 27, 1984. Plaintiff states that on November 10, 1984, he submitted three items of legal mail for mailing. On November 22, 1984, these items were returned to plaintiff with an explanation from the defendant, Darlene Moody, as follows:

> Manila envelopes are considered contraband and are not to be used by offenders for mailing out of the institution. The only exception is legal mail being sent out directly from the law library. These envelopes cannot be purchased in the Commissary or received through the mail, so it is believed that they are taken from state property—which could result in a conduct report.

> All personal property mailed out of the institution must be sent out through the Personal Property Office.

In his complaint, plaintiff admits that he obtained the manila envelopes from the St. Joseph County Jail during the time period when he was incarcerated at that institution. He admits that the envelopes in question were not obtained from the law library at the WCC or from any other location at Westville. Darlene Moody in her affidavit explained the procedure whereby an inmate may mail a large item of legal mail in a manila envelope. Moody explained that the mailroom will only accept manila envelopes which are issued by the law library. Pursuant to the rules at the WCC, manila envelopes are considered to be contraband because inmates have used such envelopes in the past to store and carry personal property during an escape attempt. Therefore, if an inmate wishes to mail an item of legal mail in a manila envelope he must obtain that envelope from the library and deposit the manila envelope at the library. Since plaintiff's manila envelopes were not issued by the law library, the mailroom refused to mail the items and returned them to plaintiff.

The third factual basis for plaintiff's cause of action is contained in grievance forms attached to the complaint dated December 27, 1984 and January 2, 1985. Plaintiff states that on several occasions the defendants refused to mail several items of correspondence. The mail was returned to plaintiff because his return address on the envelopes did not contain his dorm number as required by institutional rules. On January 29, 1985, a D.B. Jordon responded to the January 2, 1985 grievance by stating that:

> Procedures exceeded requirement of policy. Has been discontinued. Process mail accordingly.

In her affidavit, Moody explained that the rules and policy of the Indiana Department of Corrections and the WCC only require an inmate to include his name and identification number on all correspondence. The action of rejecting plaintiff's mail because of the lack of a dorm number in the return address exceeded Department of Correction policy and was improper. Moody learned of this improper practice upon receipt of plaintiff's grievance and the practice was immediately discontinued.

Moody explained that inmates are encouraged and requested to include dorm numbers in return addresses since such information assists the mailroom staff. While such information is not required, it is requested. Upon notification of this improper procedure, Moody instructed the mailroom staff to discontinue the policy.

In *Averhart v. Shuler*, 652 F.Supp. 1504 (N.D.Ind.1987), *aff'd mem.*, 834 F.2d 173 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1045, 98 L.Ed.2d 1008 (1988), this court addressed a mail issue and the type of conduct required to rise to the level of a constitutional violation. The court recognized that a defendant must act with deliberate indifference towards the treatment of plaintiff's mail or plaintiff's claim would not rise to a constitutional magnitude. *Id.* at 1509 (citing *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).

■ Case law clearly indicates that prison authorities may impose reasonable rules and procedures governing inmate mailing. *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Mauricio v. Bronnenberg,* 668 F.Supp. 1206 (N.D.Ind. 1986); *Williams v. Duckworth,* 617 F.Supp. 597 (N.D.Ind.1985); *McChristion v. Duckworth,* 610 F.Supp. 791 (N.D.Ind. 1985); *Hendrix v. Faulkner,* 525 F.Supp. 435 (N.D.Ind.1981), *aff'd in part, vacated in part,* 715 F.2d 269 (7th Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3587, 82 L.Ed.2d 885 (1984). In this case, mailroom personnel were acting pursuant to mail rules and regulations and rejected plaintiff's mail when he failed to comply with these rules. In one instance, the mailroom staff rejected plaintiff's mail even though it complied with all rules and regulations. This was the result of an error or mistake by the mailroom personnel. Once informed of the error, the defendants promptly implemented a remedy and corrected the situation. The facts of this case simply fail to support any inference of deliberate indifference on the defendants' behalf.

### V.

The plaintiff's final complaint alleges, in two parts, that his due process rights were violated by the proceedings of the Conduct Adjustment Board (CAB).

The plaintiff's complaint states that he began his incarceration with the Indiana Department of Correction on or about September 7, 1984. The plaintiff's activation date for work/study release was determined to be Friday, September 7, 1984. The plaintiff believes that he was eligible for work release on that date because of his "F–3" classification. The State has admitted that this classification would allow for work release.

Plaintiff was then transferred from the Reception–Diagnostic Center to the Westville Correctional Center where he arrived on September 13, 1984. On that date, plaintiff received a conduct adjustment report and was found not guilty of this conduct violation on September 26, 1984. On October 5, 1984, the defendant, G. Michael Broglin, ordered a rehearing of plaintiff's case. A rehearing was held on October 17, 1984, and plaintiff was found guilty. After internal appellate procedures, this conviction was reversed on December 12, 1984.

Due to the conduct report and the proceedings before the CAB, the plaintiff was not allowed to participate in work release.

■ The plaintiff's first claim is that the second CAB proceeding, after he had been found not guilty in the first proceeding, violated the Double Jeopardy Clause. It is well settled that the scope of the Double Jeopardy Clause is limited to criminal prosecutions. *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). Prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed. 2d 935 (1974).

Although the decision to order a rehearing, after the plaintiff was exonerated at his first hearing, may clash with some notions of fairness, it is not actionable under the Double Jeopardy Clause.

■ The second part of the plaintiff's claim is that he was denied due process because he had a protected liberty interest in work release. This issue need not detain this court long. Because Indiana statutes and Department of Corrections regulations only hold out the possibility of work release, this court has previously held that the State of Indiana has not created a protected liberty interest in work release. *Young v. Hunt,* 507 F.Supp. 785 (N.D.Ind. 1981); *see also, Ervin v. Blackwell,* 733 F.2d 1282, 1285 (8th Cir.1984); *Jones v. Lane,* 568 F.Supp. 1113 (N.D.Ill.1983).

### VI.

It is ORDERED that the defendants' Motion for Summary Judgment is GRANTED. Judgment shall enter for the defendants against the plaintiff. Each party will bear its own costs. IT IS SO ORDERED.

## ORDER

This case is before the court on petitioner's motion for leave to file an amended writ of habeas corpus. This court having reviewed the motion, and being duly advised in the premises hereby GRANTS the same.

Accordingly, it is ORDERED that petitioner's motion for leave to file an amended writ of habeas corpus be and is hereby GRANTED. IT IS SO ORDERED.

## ORDER

This case is before the court on plaintiff's motion for leave to file an amended complaint. This court having reviewed the motion, and being duly advised in the premises hereby GRANTS the same.

Accordingly, it is ORDERED that plaintiff's motion for leave to file an amended complaint be and is hereby GRANTED. IT IS SO ORDERED.